# In the United States Court of Federal Claims

No. 12-332C

(Filed Under Seal:  October 5, 2012)

(Reissued for Publication: October 16, 2012)

| | | |
|---|---|---|
| ************************************* * | | |
| IHS GLOBAL INC., | * | |
| Plaintiff, | * | |
| v. | * | Bid protest; Challenge to Sole-Source Award Under CICA, 10 U.S.C. § 2304(c)(1); Ownership of Technical Data Rights; DFARS Provision for Resolving Data Rights Disputes; Analysis of Standing Requirements. |
| THE UNITED STATES, | * | |
| Defendant, | * | |
| and | * | |
| BAE SYSTEMS INC., | * | |
| Defendant-Intervenor | * | |
| ************************************* * | | |

*Richard J. Conway*, with whom were *Jade C. Totman* and *Adele H. Lack*, Dickstein Shapiro, LLP, Washington, DC, for Plaintiff.

*Douglas G. Edelschick*, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk Manhardt*, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for Defendant.

*Thomas P. Humphrey*, with whom were *John E. McCarthy Jr.*, *James G. Peyster*, and *Derek R. Mullins*, Crowell & Moring LLP, Washington, DC, for Defendant-Intervenor.

## OPINION AND ORDER[1]

WHEELER, Judge.

In this bid protest brought pursuant to 28 U.S.C. § 1491(b)(1), Plaintiff IHS Global Inc. challenges the United States Air Force's planned award of a sole-source contract to Defendant-Intervenor BAE Systems Inc. When awarded, the contract will be for certain specialized information technology services necessary to track parts obsolescence for the Air Force's aircraft and space weapon systems. The Air Force asserts that it can award the contract only to BAE Systems because BAE owns the rights to certain data needed to perform the contract. IHS disagrees, alleging that BAE's claim to ownership is based upon an undated, unsigned license agreement, and therefore is invalid. If the Air Force simply determined as it should that BAE does not own the data rights, IHS argues that the Air Force could make this data available to potential offerors and conduct a competitive procurement in compliance with the Competition in Contracting Act, 10 U.S.C. § 2304 (a)(1). IHS separately contends that, even without the data covered by the questioned license agreement, IHS could compete for the contract if the Air Force made available a certain data set known as the Next Higher Assembly data.

The Government's position is that, faced with the alternative of pursuing costly and time-consuming litigation to challenge BAE's assertions of ownership, it has instead decided to acquiesce in these claims, but include contract terms going forward that will require BAE to grant the Government unlimited rights in the data needed to compete the contract in the future.

The Government and BAE both argue that, aside from the data rights issue, IHS's parts management tool lacks the minimum technical capacity needed to perform the contract, and therefore IHS lacks standing as a qualified offeror. In addition, BAE contends that IHS is precluded from bringing this bid protest by its failure to submit a statement of capability to the Air Force within the period specified by the agency's pre-solicitation notice of intent. Defendant and BAE both contend that, even if the Court finds IHS to possess standing, the Air Force's decision to make a sole-source award is lawful as an exception to the Competition in Contract Act, 10 U.S.C. § 2304(c)(1) ("The head of an agency may use procedures other than competitive procedures only when . . . the property or services needed by the agency are available from only one responsible source … and no other type of property or services will satisfy the needs of the agency.").

---

[1] The Court issued this decision under seal on October 5, 2012 and invited the parties to submit proposed redactions of any competition-sensitive, proprietary, confidential, or other protected information on or before October 12, 2012. Plaintiff IHS proposed no redactions, while the Government and Intervenor Defendant agreed that the exact number of data fields that BAE claims to have developed with mixed funding should be redacted. The Court accepts and applies these limited proposed redactions, which are indicated in the decision by brackets and three asterisks, [* * *].

<␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀␀

<␀␀

Defendant and BAE have filed motions to dismiss for lack of subject matter jurisdiction. In addition, all three parties have filed cross-motions for judgment on the administrative record. For the reasons explained below, the Court finds that IHS has not satisfied its burden to demonstrate, by a preponderance of the evidence, that it is currently a qualified offeror for the contract in question, as is required in order to establish standing. The Court therefore grants Defendant's and BAE's motions to dismiss for lack of subject matter jurisdiction, and denies as moot the respective motions for judgment on the administrative record.

## Background

The solicitation in this case involves "obsolescence management" services utilized by the Air Force to manage its aircraft and space weapon systems. Collectively, these weapon systems involve millions of individual parts, any of which may need to be replaced due to normal wear and tear or for repair work. "Obsolescence management" involves keeping track of those parts and their current availability in the market, and forecasting when the parts might become obsolete. The process also involves securing and maintaining adequate replacement parts. Generically, the sophisticated computer software used to conduct this work is called a Diminishing Manufacturing Sources and Material Suppliers ("DMSMS") tool.

Since 2001, the Air Force has awarded a series of sole-source contracts to Defendant-Intervenor BAE Systems Technology Solutions & Services Inc. ("BAE") for the use of its DMSMS tool, which BAE has named Advance Components Obsolescence Management ("AVCOM").[2] Plaintiff IHS Global Inc. ("IHS") challenges the Air Force's latest such proposed sole-source procurement to BAE, the pre-solicitation notice for which was issued on May 14, 2012, with a response date of May 29, 2012. Administrative Record ("AR") at Tab 108, p. 3123. IHS filed this bid protest on May 29, 2012. The Air Force's most recent contract for the AVCOM tool expired on June 30, 2012. Royce L. Smith Decl., Aug. 27, 2012, at ¶ 4.

While the legal issues and the applicable technology are relatively complex, there are essentially two main areas of dispute. First, the parties disagree on which entity currently owns certain data necessary for the performance of the contract. Secondly, even if the contested data is made available to IHS (and other potential offerors), the parties dispute the current technical capacity of IHS's DMSMS tool, 4DOnline, to track, sort,

---

[2] The Air Force's original award was to BAE's predecessor-in-interest, Manufacturing Technology, Inc. ("MTI"). BAE later acquired MTI as well as all rights to the AVCOM tool, which the Air Force has used continuously since the first contract award in 2001. However, the record does not reveal the exact date on which BAE acquired MTI and the AVCOM tool. Therefore, and for the sake of simplicity, the Court will refer to both entities as "BAE" regardless of the date on which a given event occurred.

and analyze this data. The Court will briefly explain the history of the Air Force's contractual relationship with BAE and the nature of these disputes before turning to the relevant legal issues.

I.   Data Ownership

The data ownership issues implicated by this case can themselves be broken into two categories. First, IHS challenges BAE's assertion of ownership over [* * *] data fields it claims to have developed with mixed government-contractor funding, and thus to own pursuant to an alleged agreement – "License 2" – with the Government. Secondly, IHS contends that, at a minimum, the Government can and should make available to potential offerors certain data known as the "Next Higher Assembly" ("NHA"), and that the possession of this data alone would allow IHS and other potential offerors to compete for the contract.

A.   License 2 and the Purportedly Mixed-Funded Data

The Air Force and BAE entered into their first DMSMS contract, which called for BAE to develop the AVCOM tool for widespread agency use with mixed Government and contractor funding, in March 2001. AR at Tab 2. It is uncontested that in October 2001these parties then signed a modification to the first contract, the terms of which included a valid Specifically Negotiated License ("SNL") for Computer Software, "License 1." AR at Tab 4, p. 136-49. Although BAE contends otherwise, by its express terms, License 1 limits, pursuant to DFARS , the Air Force's rights in the AVCOM *software*, and these rights only. See ("FAR") and the Defense Federal Acquisition Regulation Supplement ("DFARS") 252.227-7014.

The Administrative Record also contains the draft of a second license, "License 2," that would have similarly limited the Government's rights in any AVCOM *data* developed through the use of mixed funding.[3] AR at Tab 4, p. 150-51. However, this license is neither signed nor dated, nor was it ever incorporated into any contract. In addition, as the Air Force notes, none of the contracts entered into between the Air Force and BAE from 2005 forward contain any reference to either SNL. Gov't Mem. at 3-4 (citing AR at Tabs 5, 6, 8, 11, 14, 15, 17, 19, 21, 22, 24, 27, 28, 30, 38, 71).

---

[3] As discussed in more detail below, there is no dispute that the Government has unrestricted rights in all data developed exclusively with public funds. BAE has identified 24 such data fields, all of which were to be made available to prospective offerors in two (ultimately canceled) competitive solicitations that preceded the sole-source solicitation here at issue. See AR at Tab 57.1, p. 2263 (BAE-generated list of these data fields); Tab 87, p. 2787 (first competitive solicitation, issued 2011) ("At the beginning of [the contract performance period], contractor will be provided flat files … contain[ing] … 24 government owned part attributable data fields …"); Tab 97, p. 2975 (second competitive solicitation, issued 2012) (identical).

Nonetheless, BAE contends, and the Air Force agrees, that License 2 "is effective and applies to all [AVCOM] contracts." Gov't Mem. at 4. Essentially, BAE's position with respect to License 2 is that although "everyone [*i.e.*, BAE and the Air Force] knew" that License 1 "included both software *and data* rights," BAE Mem. at 30 (emphasis added), License 2 was drafted to "clarify" this understanding, id. at 3. BAE therefore contends that, notwithstanding the parties' failure to finalize and ratify the second license, "[a]t all times" since BAE drafted License 2, the two parties "have operated pursuant to the understanding set forth in License []2 as to the Government's [limited] rights to both the AVCOM software and data." [4] Id. Finally, BAE contends that, in any event, "the only proper mechanism for challenging [its] data rights assertions is an administrative challenge proceeding" pursuant to 10 U.S.C. § 2312 and DFARS 252.227–7103, which, as BAE points out, can only be initiated by the Government, which has not done so here. BAE Reply at 18.

The Government's position on the licenses varies somewhat from BAE's position, though not in the bottom line. First, in contravention of BAE's assertion, the Government denies that it ever understood License 1 to limit its rights in data; in its words, "no one contends that License 1 has any applicability to technical data rights." Gov't Mem. at 26. In addition, while the Government "agree[s]" with BAE's second assertion, that License 2 effectively governs all of the DMSMS contracts between the two entities, Gov't Mem. at 4, it has also suggested that this position is largely a pragmatic one.

By way of background, evidence in the Administrative Record indicates that the Air Force has not always held this view. For example, IHS cites a June 2010 email exchange between the Air Force and BAE in which a contracting officer challenged BAE's broad assertion of data rights. The exchange in question arose during the course of the Air Force's market research into the viability of opening the DMSMS contract to competition. As part of its research, the Air Force sought to clarify with BAE exactly which data rights, if any, the company believed it possessed. Responding to the Air Force's initial inquiry, a BAE manager stated that there were "millions upon millions of data elements that we've captured from Government tech data *or* determined through BAE research" that no other currently-available predictive DMSMS tool could accept, utilize, or display, and that "[t]he BAE Systems data among these millions of data elements is integral to our business and is therefore proprietary." Dkt. Entry 56-1, at p. 6 (email exchange admitted as a supplement to the Administrative Record) (emphasis in original).

On June 17, 2010, Air Force Contracting Officer James Williams replied that:

---

[4] BAE asserts that it drafted License 2, at the Government's request, in November 2001. However, as IHS points out, there is no evidence in the Administrative Record to substantiate either of these claims.

> [A] simple statement that there are data elements in AVCOM that are not accepted / utilized / displayed by any other [DMSMS] predictive tool [does] not explain what is and is not transferable. Though you may have data elements in place that you believe are not covered in other tools, that [does] not mean that these elements can't be added or captured in those tools…. My greatest issue … is that you state that '[t]he BAE Systems data among these millions of data elements is integral to our business and is therefore proprietary.' I fail to understand how you feel that information provided to you by the Government and analysis performed through Government contracts is proprietary to BAE. If we paid for contractors to perform analysis and solve obsolescence issues then we should have the rights to that data. Any solution that the Government paid to be completed and entered into your system should be available for us to transfer… I am really not sure how your company believes that it is appropriate to maintain the rights to solutions paid for and completed by the Government.

Id. at 3.

At this point, and in response, BAE provided to the Government a comprehensive list of the data fields maintained by the AVCOM tool. Of these, BAE stated that 24 had been developed solely with Air Force funds, and therefore were owned by the Government. AR at Tab 57 and 58. BAE further asserted that an additional [* * *] fields were developed with mixed Air Force-BAE funds and therefore belonged to BAE. Id. BAE also categorically stated at this time that it would not sell these data rights to the Government. Id. at Tab 57, p. 2262.

As set forth in more detail below, the Air Force nonetheless proceeded to attempt, twice, to open the DMSMS contract to competitive proposals, on the theory that providing the 24 publicly-owned data fields to interested parties would at least potentially allow other offerors to compete for the contract. However, as the Air Force expressly stated in its Acquisition Plan, "[a] new contractor's ability to provide the level of performance required" by the contract was "unknown." AR at Tab 84, p. 2650. After IHS protested that it would need other data in addition to these fields in order to compete, the Air Force cancelled each of the respective competitive solicitations and ultimately issued the pre-solicitation notice for the sole-source contract now at issue.

The Air Force states in this case that it "agree[s]" with BAE's contention that License 2 "is effective and applies to all contracts." Gov't Mem. at 4. Further, as the Air

Force interprets its contracts with BAE, even if License 2 is invalid and the Government therefore possesses unrestricted rights to all of the mixed-funded AVCOM data, these contracts do not authorize the Government to demand the delivery of such data from BAE.  However, disturbingly, the Air Force is not entirely consistent in explaining why this is so.[5]  The Air Force also argues that it is simply more practical and cost-effective for the agency to resolve the issue with BAE through the imposition of future contract terms rather than through litigation on past contracts.

As the Government states, "[w]hatever the merits of BAE's underlying data rights claims," had the Air Force decided to contest these claims, it "would have become entangled in litigation that could have lasted one or two years, during which time the agency would not have had a DMSMS tool[.]"  Gov't Reply at 14.  Given such costs, as well as the inherent uncertainty of the outcome of such litigation, the Air Force states that it has instead decided to include terms in its next anticipated contract with BAE – *i.e.*, the sole-source procurement at issue here – that will both grant the Air Force unlimited rights in ten additional data fields, and require BAE to deliver the data fields at the end of the contract period.  Specifically, the proposed procurement contains the following clause:

> The contractor shall deliver all 34 part attribute data fields listed in Appendix B at the end of this contract period of performance at no additional cost to the government.  The government shall have an[] "Unlimited Rights" license to all data listed in Appendix B at the end of this contract.  All data listed in Appendix B shall be in a flat file format easily transferrable and usable by the government without any reverse engineering effort.

AR at Tab 112.2, p. 3200; see also id. at p. 3223 (Appendix B, listing the 34 data fields in question).

---

[5] In its opening brief, the Air Force stated categorically that it "has not previously contracted with BAE for the delivery of this data," and argued that in the absence of an express delivery contract provision, it could possess, at most, only "inchoate" data rights.  Gov't Mem. at 27.  However, in its reply, the Air Force adopted the position first advanced in BAE's opening brief, that the most recent base contract between the Air Force and BAE, dated June 30, 2005, did contain a provision allowing the Government to require data delivery, but not "after Seven years following [the] basic contract award."  See BAE Mem. at 32 n.15; Gov't Reply at 13; AR at Tab 5, p. 178.  BAE and the Air Force therefore argue that any right the Air Force may have had to demand the delivery of any portion of the relevant data expired on either June 30, 2012 (see BAE Mem. at 32 n. 15) or July 1, 2012 (see Gov't Reply at 13).

The 34 data fields consist of the 24 to which all parties agree the Government already holds unlimited rights, as well as ten additional specified fields, among them the Next Higher Assembly data discussed below. Id. at p. 3223. The Air Force has averred that collectively, this data constitutes "all necessary data" for the performance of future contracts. Gov't Reply at 3, 14. It has also represented to the Court that it "absolutely" intends to engage in competition for the contract as soon as it can. Transcript of Oral Argument, Sept. 18, 2012 ("Tr.") at 40. To these ends, although the canceled competitive procurements each proposed a five-year term, the challenged sole-source contract is limited to one base year and one additional option year. AR at Tab 107, p. 3115. Finally, the Air Force also states in its Justification & Approval ("J&A") for the award that should another capable source become available during the first year, it will not exercise the contract option. Id. at p. 3118; but see Tr. at 44 (government counsel conceded that the goal of competing the contract within one year is "aggressive" and "uncertain").

In response, IHS's primary contention is that License 2 cannot have any relevance or meaning because, in contravention of the requirements set forth in DFARS 252.227-7013, it was never executed, does not list the data purportedly restricted under its terms, and was never incorporated into any contract. See IHS Mem. at 14-15; IHS Resp. at 3-5. Among other arguments, IHS also points out that there is no evidence in the Administrative Record that BAE developed the AVCOM tool using anything other than the funds provided to it by the Air Force for the performance of its AVCOM contracts, and that it is therefore unclear whether *any* of the data can properly be characterized as mixed-funded. IHS Mem. at 19. Thus, even if License 2 (which purports to limit the Government's data rights *only* in data developed with a mixture of public and private funds) were valid, it is not clear that BAE is entitled to assert ownership of the data in question.[6]

B.  Next Higher Assembly Data

Separate from the various data ownership issues related to License 2, IHS argues that even without the data allegedly protected by that license, it "could still perform the contract with the 24 Government-provided data fields as long as it had one additional data part attribute" – namely, the Next Higher Assembly, or "NHA," data. IHS Mem. at 21. To explain what this term signifies, IHS supplied the simplified example of a bicycle, which the Court will borrow. As IHS noted:

> [A] basic bicycle is made up of sub-assemblies, such as wheels and brakes. One wheel may consist of one tire and ten

---

[6] BAE claims to possess evidence supporting this claim, and further asserts that IHS's argument here only "proves BAE System's point" regarding its entitlement to a separate administrative process through which it could introduce the same. BAE Reply at 19.

> spokes, while a brake assembly may consist of two brake pads….[The DMSMS] tool must first know how many parts are needed and where they fall in the structure of the bicycle in order to assess the impact of a part shortage.

IHS Mem. at 2.  In this example, the wheel and brake assemblies constitute the NHA data, which IHS contends – and neither Defendant contests – constitutes a necessary input into any DMSMS tool capable of performing the contract here at issue.

As IHS points out, in June 2010, when BAE created a list of [* * *] data fields over which it asserts ownership rights, it did not include the NHA data in that list.  See AR at Tab 57.1.  Nor, however, did BAE include the NHA data in the list of ten Air Force-owned data fields it provided at the same time.  Id.  It is IHS's contention that the Air Force therefore owns this data, and that even if the agency could not require BAE to deliver the data, it "could just as easily provide" the NHA data by extrapolating it from its Part Configuration Management System ("PCMS").  IHS Reply at 15.

Although neither the Government nor BAE directly addressed this issue in their briefs, at oral argument government counsel stated that this omission was due to the fact that:

> [the] PCMS data is not discussed anywhere in the Administrative Record, and we limited our arguments to what we felt was appropriate, which is the Administrative Record.  The PCMS data is not the cure-all that the Plaintiff would have this Court believe.
>
> First of all, it is not correct to say that the PCMS data includes all of the Next Higher Assembly data that the Plaintiff is interested in…. Some Next Higher Assembly data is in this PCMS set, but it's less than half, and the data hasn't been scrubbed….There is no basis in the Administrative Record for [Plaintiff's] arguments that all we need is data that the Government already has ... There's no basis for that at all and, in fact, if we were to get into it, they're not correct as a technical matter.

Tr. at 39.

### C.  The Air Force's Requirements Under the Challenged Procurement

In addition to, and separate from, all of the data rights issues described above, both the Government and BAE contend that IHS's current DMSMS tool, 4DOnline, lacks the

9

technical capacity to meet the minimum requirements of the challenged procurement. In support of this argument, these parties point to, *inter alia*, IHS's recent past performance on a similar contract for one specific Air Force Base ("AFB"), as well as several statements that IHS made concerning its capability to perform the work required by the contract during each of the Air Force's two prior attempts to award the procurement competitively.

### 1. IHS's Prior Performance on the Warner Robbins AFB Contract

In 2009, the Air Force awarded a competitive contract to IHS for the provision of a DMSMS tool for a single base, Warner Robins AFB. AR at Tab 33. IHS, with its partner ARINC Engineering Solutions, Inc. ("ARINC"), used the same tool that IHS states it would like to offer now, the 4DOnline BOM Manager ("4D Online"), to perform this contract. See Robert Braasch Decl., Sept. 4, 2012, at ¶ 6; AR at Tab 43, p. 4162-63; Tab 50, p. 2237-38, 2246; Tab 56, p. 2660. This contract required this IHS/ARINC tool to "have existing functionality to provide immediate tracking and statusing of all electronic components[,]", as well as "separate fields for all relevant component data," including but not limited to, for example, the part description, approved vendor part number, and National Stock Number ("NSN"). AR at Tab 33, p. 1968.

However, in performing this contract, the Administrative Record demonstrates that IHS fell short of this requirement, among others not directly relevant here. Specifically, 4DOnline lacked the ability to track, process, and analyze nine of the required part attribute data fields. Id. at Tab 58, p. 2264-65. IHS, through a declaration submitted by its Senior Director of Technical Support, does not deny that IHS failed to deliver a compliant tool capable of managing these data fields. See Braasch Decl. However, IHS states that "the ARINC/IHS team did propose and was capable of delivering such a tool to Robins with these data fields, but … was advised by the Robins customer office" that the Air Force had found an internal work-around to the problem, "and thus did not want to task the ARI[N]C/IHS team to duplicate this effort." Id. ¶ 8.

### 2. The Current Technical Capacity of the IHS 4DOnline Tool

Both of the cancelled competitive solicitations that preceded the proposed sole-source award contained similar contract requirements respecting mandatory data fields. Specifically, and as relevant here, the Air Force currently requires its DMSMS vendor to have separate fields for, and the capability to analyze and run reports on, the following six data fields (among others): (1) the NSN, AR at Tab 87.4, p. 2801 (first solicitation) and Tab 97.2, p. 2990 (second solicitation); (2) the Weapon System Designator Codes ("WSDC"), id. at Tab 87.4, p. 2801 and Tab 97.2, p. 2989; (3) the Work Unit Codes ("WUC"), id. at Tab 87.4, p. 2800-01 and Tab 97.2, p. 2989; (4) the Hardness Critical Items ("HCI") identifiers, id. at Tab 87.4, p. 2801 and Tab 97.2, p. 2990; (5) the Critical Safety Items ("CSI") identifiers, id. at Tab 87.4, p. 2801 and Tab 97.2, p. 2990; and (6)

Radiation Hardened Items ("Rad Hard") identifiers, id. at Tab 87.4, p. 2801 and Tab 97.2, p. 2989.

The Performance Work Statement ("PWS") in the second cancelled competitive solicitation also contained the following provision, making explicit the Air Force's requirement that any qualified tool be immediately capable of meeting these technical standards:

> This requirement is considered sustainment and does not allow for development or modernization of a contractor's IT capacity. This requirement does not allow for the government's purchase of software modifications or software enhancements. This requirement does not allow for the government purchase of computer hardware. At the time of proposal, the contractor shall have a complete IT capability which has the ability to perform the requirements as stated in this PWS.

Id. at Tab 97.2, p. 2976.

IHS has never asserted that any of these data fields are either overly restrictive, or the subject of any data rights controversy. See AR at Tab 90 (IHS's GAO protest of the first solicitation); Tab 99 (IHS's GAO protest of the second solicitation). However, industry research prepared by the Air Force in advance of the (cancelled) competitive solicitations determined that 4DOnline still could not track and manage nine required data fields, including several of those listed above, without further technical development. See AR at Tab 74, p. 2570.[7] In addition, IHS (and its partner ARINC) made multiple statements to the Air Force conceding that its current tool falls short of various other requirements specified under the contract. See id. at Tab 43, p. 4162 (Request for Information response from IHS/ARINC, conceding that the 4DOnline could not meet all contract requirements without further development); Tab 50 at 2246-47 (same); Tab 56 at 2260 (IHS/ARINC Industry Day presentation, admitting "gaps" in the 4DOnline tool, but stating they could be corrected "within 4 to 6 months of contract award").

Again, IHS counters with a statement from Mr. Braasch, that "[t]he IHS/ARINC team, had this been a competitive procurement, would have offered a combination of IHS and ARINC tools that meet all the requirements" of the contract. Braasch Decl. ¶ 7. Further, according to Mr. Braasch, "[b]ased on my knowledge … the tools of the

---

[7] IHS claims that the Air Force research relied on an outdated study performed by Booz Allen Hamilton in 2006. IHS Reply at 19. This is plainly incorrect: the market research cited by the Air Force was performed in 2011 and expressly references the 4DOnline tool. AR at Tab 74, p. 2570.

IHS/ARINC team would include the NSN, WSDC, WUC, HCI, SCI and Rad Hard data fields, the ability to query these fields, and the ability to generate reports concerning these fields." Id.

Discussion

As noted above, the Government and BAE both argue that IHS lacks standing to bring this bid protest, and have therefore filed motions pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1) requesting that the Court dismiss the case for lack of subject matter jurisdiction. Both entities contend that IHS lacks standing because it cannot demonstrate that its DMSMS tool, 4DOnline, is currently capable of performing the full requirements of the challenged procurement. BAE also argues that IHS lacks standing because of its failure to submit a timely statement of capability to the Air Force. For the reasons explained below, the Court agrees with the first of these arguments, and therefore grants the motions to dismiss.

"The Court of Federal Claims, though an Article I court, ... applies the same standing requirements enforced by other federal courts created under Article III." Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003). Whether a plaintiff has met these requirements is "a threshold jurisdictional issue," Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002), such that a "lack of standing precludes a ruling on the merits," Media Techs. Licensing LLC v. Upper Deck Co., 334 F.3d 1366, 1370 (Fed. Cir. 2003). As the party invoking the federal jurisdiction of this court, the burden is on IHS to establish that it has standing to pursue its claims. Myers, 275 F.3d at 1369 (citing, *inter alia*, Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

IHS asserts jurisdiction under 28 U.S.C. § 1491(b)(1), which provides that this Court may "render judgment on an action by an interested party objecting to ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." The "pivotal element" of this test is "whether a protestor qualifies as an 'interested party,'" RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 481, 485 (Fed. Cl. 2009), which the Federal Circuit has defined as those "prospective bidder[s] or offeror[s] whose direct economic interest would be affected by the award of the contract or by failure to award the contract," Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("AFGE") (construing the phrase "interested party" in accordance with the definition provided in the Competition in Contracting Act, 31 U.S.C. § 3551(2)), cert. denied, 534 U.S. 1113 (2002); see also Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). Accordingly, "to come within the Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction," a plaintiff "is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." Rex Serv. Corp., 448 F.3d at 1307.

A defendant may raise either facial or factual challenges to a plaintiff's claim to have met these two requirements. See Cedars-Sinai Med. Ctr. V. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993). In a facial challenge, where a defendant challenges the sufficiency of the facts alleged in the complaint to establish the plaintiff's standing, the Court must accept the plaintiff's well-pleaded factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. Id. at 1583 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). However, where, as here, "the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction … the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion." Id. (internal citations omitted); Shoshone Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1030 (Fed. Cir. 2012). In such a case, "[i]n resolving [any] disputed predicate jurisdiction facts, 'a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings,'" for example, as here, the contents of the Administrative Record. Shoshone Indian Tribe, 672 F.3d at 1030 (quoting Cedars-Sinai Med. Ctr., 11 F.3d at 1584). In addition, it is the plaintiff's burden to establish any challenged jurisdictional facts by a preponderance of the evidence. Sci. Applications Int'l Corp. v. United States, 102 Fed. Cl. 644, 651 (Fed. Cl. 2011).

I. Actual or Prospective Offeror

Typically, to qualify as an actual or prospective offeror, a protestor must have submitted an offer or bid on a government contract by the closing date for the solicitation, or, in the case of some pre-award protests, "be expecting" to do so. MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989). Here, of course, the challenged solicitation was not open for bidding, and IHS did not submit either a bid or a statement of capability within the established timeframe. Although IHS claims that its failure to do so was the direct byproduct of various illegalities in the procurement process, BAE (but not the Air Force) argues that this failure nonetheless precludes IHS from establishing standing to challenge the procurement. The Court disagrees.

BAE stakes its argument to four primary cases, which the Court will discuss in turn. The first, Rex Serv. Corp., 448 F.3d 1305, involved a challenge by a provider of certain component parts of aviation equipment to a contract award by a Department of Defense ("DoD") subagency. The plaintiff neither submitted an offer nor filed a protest in this Court before the closing date of the solicitation, but instead filed (within the solicitation period) an administrative protest, alleging that certain agency illegalities prejudiced, but did not preclude, it from bidding on the contract. Id. at 1307-08. In holding that the plaintiff was not a prospective bidder, the Federal Circuit emphasized that "Rex *could have bid, but chose not to*." Id. at 1308 (emphasis added). It held that under these circumstances, it was irrelevant that the plaintiff had filed a pre-award administrative protest claiming that agency illegalities merely "*prejudiced* its ability to bid." Id. (emphasis added). As the Court summarized:

13

> [i]n the end Rex did not submit a bid; nor did it file a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid prior to the close of the solicitation period, but was prevented from doing so on the basis of improper agency action.

Id. at 1308 (citing MCI Telecomms. Corp., 878 F.2d at 365).

As BAE notes, in Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380, 1384-85 (Fed. Cir. 2012) the Federal Circuit recently extended the basic principles of Rex Serv. Corp. to the sole-source context as well. Digitalis involved a DoD sole-source award for the provision of digital planetariums for its schools. Id. at 1382-83. After the award had already been made, the plaintiff learned of the procurement and sought to challenge it. Id. at 1383. In denying the plaintiff "prospective bidder" standing, the Federal Circuit held that:

> [w]e see no reason to limit [Rex] to competitive procurements … In a sole-source award such as this one, the notice of intent issued by the government is analogous to a request for … proposal[s]. Interested parties are invited to submit statements of capability in order to convince the government that it should hold a full competition for the contract rather than sole-source the contract to the proposed contractor. We therefore hold that in order to be an actual or prospective bidder, a party must submit a statement of capability during the prescribed period.

Id. at 1385. Latching onto the last sentence in this passage, BAE argues that IHS's failure to submit a statement of capability during the prescribed solicitation period precludes it from establishing standing to bring this protest.

However, while this language does, at first blush, appear to be quite categorical, the Court finds that it does not control here, for several reasons. As a threshold matter, the Court notes that it abides, as it must, by Digitalis's extension of Rex Serv. Corp. to challenges brought against sole-source procurements. Nonetheless, because the former case relied so heavily on the latter, and indeed held that "the rule of Rex Service controls the result of this case," the Court notes that certain passages of Digitalis appear to either mis- or overstate both the facts and holding of the predecessor case, in ways that are quite material here. For example, Digitalis describes the plaintiff in Rex Serv. Corp. as having "argued that the government's violations of certain statutes and regulations *prevented* it from filing a proposal or bid." 664 F.3d at 1385 (citing Rex Serv. Corp., 448 F.3d at 1307) (emphasis added). In a similar vein, it describes the holding in Rex Serv. Corp. as

14

follows:  "if a party does not bid during the bid period, it does not have standing regardless of any illegalities by the government in the bid process."  Id.

Neither of these characterizations is fully correct.  As explained above, Rex Serv. Corp. was at pains to emphasize that the plaintiff there claimed only that it was "prejudiced … but … not prevent[ed]" from bidding on the challenged procurement.  448 F.3d at 1307; see also id. at 1308 (noting the same distinction multiple times).  Moreover, in denying the plaintiff "prospective bidder" standing, Rex Serv. Corp. expressly listed among that entity's relevant shortcomings its failure to "timely [file a] bid protest … in which it established that … [it] was prevented from [bidding] on the basis of improper agency action."  Id. at 1308; see also, e.g., Distributed Solutions, Inc. v. United States, 104 Fed. Cl. 368, 381 (Fed. Cl. 2012) (citing Rex Serv. Corp. for the proposition that "a protestor may have standing if 'improper agency action' prevented the submission of a bid or a protest of the solicitation").

This reading of Rex Serv. Corp. comports with the Federal Circuit's long-standing and well-established interpretation of § 1491(b)(1), reiterated in Digitalis itself, that an "interested party" under that provision may be either an "actual *or prospective* bidder."  See Digitalis, 664 F.3d 1384 (emphasis added).  That is, if Digitalis has rendered a party's timely submission of either a bid (in a competitive procurement) or a statement of capability (in a sole-source procurement) an absolute prerequisite for any party seeking to file a bid protest suit, it is hard to see what meaning may be left under the "prospective bidder" heading.

Moreover, a broad reading of Digitalis would also be at odds with another equitable rule followed in this court, namely that "when the government's actions wrongfully prevent a bidder from qualifying for or bidding on a solicitation, the government cannot use the contractor's failure to qualify or bid on the solicitation as grounds for finding a lack of standing."  Reilly v. United States, 104 Fed. Cl. 69, 76 (Fed. Cl. 2012) (quoting KSD, Inc. v. United States, 72 Fed. Cl. 236, 247 (Fed. Cl. 2006)); see also, e.g., Infrastructure Defense Techs., LLC v. United States, 81 Fed. Cl. 375, 385 (Fed. Cl. 2008); accord Science Applications Int'l Corp. v. United States, 102 Fed. Cl. 644, 650 (Fed. Cl. 2011) (the prejudice component of standing requires only that a bidder "ha[ve] been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself … or [be an entity that] would be in contention absent the … violation of applicable procurement regulations") (quoting Textron, Inc. v. United States, 74 Fed. Cl. 277, 285 (Fed. Cl. 2006)).

As Digitalis did not address, much less expressly overturn, either this rule or the "prospective bidder" prong of this Circuit's "interested party" test, the Court does not adopt the broad interpretation of that decision advanced by BAE.  The heart of IHS's claims, on the merits, is that it was unfairly prevented from bidding on the DMSMS contract due to (1) the Government's unlawful acquiescence in BAE's assertion of certain

15

data rights, and (2) the Government's unjustified failure to make the NHA data available to potential offerors. Because, as explained below, the Court finds that IHS lacks standing for the independent reason that it is not currently a qualified offeror, it does not reach, and expresses no opinion regarding, the potential merits of these claims. Nonetheless, the Court finds that the facts IHS has pled in support of these claims, as well as the evidence in the Administrative Record, suffice to establish the claims' plausibility. Therefore, if IHS were otherwise a qualified offeror, its failure to submit a timely statement of capability would not constitute an independent bar to its maintaining standing to bring this suit.

Finally, the Court notes that, contrary to BAE's selective interpretation, neither Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313-15 (Fed. Cir. 2007) nor Infrastructure Defense Technologies, 81 Fed. Cl. 375, undermines this analysis. Blue & Gold involved a National Park Service ("NPS") procurement for ferry services to and from San Francisco's Alcatraz Island. After bidding for but failing to receive the contract, the plaintiff challenged the award on the ground that the solicitation did not include the wage and benefits requirements of the Service Contract Act, 41 U.S.C. §§ 351-58. Crucially, the plaintiff had taken no action whatsoever to protest this patent error prior to the NPS's announcement that it would award the contract to another bidder. Citing the proposition that "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive [the] award and then, if unsuccessful, claim the solicitation was infirm," the Federal Circuit held that because the plaintiff had "ha[d] the opportunity to object to the terms of [the] solicitation," but had "fail[ed] to do so prior to the close of the bidding process," it had therefore "waive[d] its ability to raise the objection" in a subsequent bid protest before the Court of Federal Claims. 492 F.3d at 1314 (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (Fed. Cl. 2005), 1313.

First, it is far from clear Blue & Gold has any applicability in a standing analysis; at least one decision from this Court has held that the case "does not erect a jurisdictional bar … [but rather is derived from] the Tucker Act's non-jurisdictional mandate for 'expeditious resolution' of bid protest actions." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 697 (Fed. Cl. 2010). Even setting that objection aside, however, the "clear instruction" of Blue & Gold is simply that an "objection to the terms of the solicitation must be protested prior to the close of the bidding process." Infrastructure Defense Techs., 81 Fed. Cl. at 389; see also id. at 386 (noting that the "principle[]" of Rex Service and Blue & Gold is that when a plaintiff has filed "*neither* a proposal *nor a protest* …during the bidding period*," the agency has "not [been] afforded a [timely] opportunity to respond") (emphasis added). By filing its protest in this Court by the response date set by the pre-solicitation notice, IHS has met this requirement. See, e.g., DGR Assocs., Inc. v. United States, 94 Fed. Cl. 189, 201 (Fed. Cl. 2010) (noting that "[a] prospective offeror may file a protest at the Court of Federal Claims, without first filing an agency-level protest or a GAO protest").

II.     Direct Economic Interest

Unfortunately for IHS, however, the above analysis does not conclude the matter. Rather, in order to establish standing, the company must also demonstrate, by a preponderance of the evidence, that it "possesses the requisite direct economic interest" in the challenged contract. Rex Serv. Corp., 448 F.3d at 1307. The test for this requirement varies by the type of procurement or protest at issue. Here, "to establish standing to protest a sole-source award, 'a bidder must show that it would have been a qualified bidder.'" Defense Tech., Inc. v. United States, 99 Fed. Cl. 103, 115 (Fed. Cl. 2011) (quoting KSD, Inc., 72 Fed. Cl. at 246, and Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370-71 (Fed. Cir. 2002)); see also, e.g., Infrastructure Defense Techs., 81 Fed. Cl. at 387 (same); Enzenia!, Inc. v. United States, 80 Fed. Cl. 60, 65 (Fed. Cl. 2008) (same). As the Federal Circuit held in Myers, "[t]he mere fact that [a plaintiff] might have submitted a bid in a competitive procurement is not sufficient. Although it need not show that it would have received the award in competition with other hypothetical bidders," "[t]o have standing, [a] plaintiff [challenging a sole source contract must] establish that it 'could compete for the contract' if the bid process were made competitive." 275 F.3d at 1370-71 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001)).[8]

Because both Defendants' "Rule 12(b)(1) motion[s] challenge[] [the] complaint's allegations of jurisdiction," these allegations "are not controlling[.]" Shoshone Indian Tribe, 672 F.3d at 1030. Rather, for the purposes of deciding this motion, the Court accepts only IHS's uncontroverted allegations, and will also take into consideration extrinsic evidence, such as the contents of the Administrative Record, as well as the Braasch declaration. See id. In addition, it is the Plaintiff's burden to establish any challenged jurisdictional facts by a preponderance of the evidence. Science Applications Int'l Corp., 102 Fed. Cl. at 651.

The Court finds that IHS has failed to meet this burden. The Administrative Record clearly establishes that, by its own assessment, IHS/ARINC does not currently possess a tool that is immediately capable, as the Air Force requires, of managing and processing at least six essential data fields. The Court further finds that the statements in the Braasch declaration are not to the contrary.

---

[8] For post-award challenges to competitive procurements, the test at this step is whether "there was a substantial chance it would have received the contract award but for [the alleged error in the procurement process]." Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996). For most pre-award bid protests, the Federal Circuit recently clarified that the test is whether the plaintiff has demonstrated a "non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1361-62 (Fed. Cir. 2009) (adopting standard set forth in WinStar Commc'ns, Inc. v. United States, 41 Fed. Cl. 748, 763 (1998)).

First, with respect to IHS's past performance on the Warner Robins contract, the Court agrees with the Air Force that Braasch obfuscates the fact that IHS did not merely propose, but *promised* to deliver a tool that included these data fields.  That the Air Force decided to create an internal work-around to this deficiency rather than work with or wait for IHS to fix the problem does not change the fundamental fact, which IHS does not contest, that the company did not deliver on these contract terms.

The Court also agrees with the Air Force's reading of Braasch's carefully parsed words respecting the current technical capabilities of the 4DOnline tool.  Here, Braasch stated that "[t]he IHS/ARINC team, had this been a competitive procurement, *would have* offered a combination of IHS and ARINC tools that meet all the requirements" of the contract, and that "[b]ased on my knowledge … the tools of the IHS/ARINC team *would include* the NSN, WSDC, WUC, HCI, SCI and Rad Hard data fields, the ability to query these fields, and the ability to generate reports concerning these fields."  Braasch Decl. ¶ 7.  Id. (emphasis added).  This statement stops subtly, but decidedly, short of an averment that IHS has the complete and *immediate* capability to provide these functions, without any Government subsidy to facilitate further development, and as required under the express terms of the procurement.[9]

In reaching this conclusion, the Court notes that it shares, with IHS (as well as Air Force Contracting Officer Williams), serious doubts regarding the merits of BAE's claim of entitlement to data created through the performance of contracts wholly paid for by the Government.  Because the Court finds that IHS is not presently a qualified bidder, it does not reach the merits of either this substantive claim, or of BAE's assertions regarding the necessity of an administrative resolution as a condition precedent to the justiciability of the issue.  For the same reasons, the Court also refrains from reaching the factual question of whether it is within the Government's present power to provide potential offerors with the NHA data, either by demanding the immediate delivery of such from BAE or by distilling this data from the PCMS.

In any event, the Court agrees with the Air Force that, as a practical matter, the fastest and most efficient way for the agency to compete the DMSMS contract is through the inclusion of new contract terms requiring BAE to acknowledge the Government's unlimited rights in all data necessary to the performance of the contract, and to deliver the same at the end of the contract period.  Further, because this approach allows the Air Force to continue its obsolescence management work while it corrects the various data issues discussed above, the Court notes that its decision comports with the statutory requirement that, in bid protest cases, it "give due regard to the interests of national

---

[9] IHS makes certain claims regarding the current technological capacity of BAE to meet the contract's terms. See IHS Reply at 20-21. Whatever the merits of these claims, they are wholly irrelevant to *IHS*'s ability to establish standing, which is the only question now before the Court.

defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3). The Court fully expects that, no later than the completion of the proposed sole-source contract one, or at most two, years from now, the Air Force will be in a position to open its DMSMS contract to competition. IHS has notice of the technical developments it must make, at its own expense, should it desire to compete for the contract at that time. Of course, this Court would have jurisdiction to resolve any disputes that may arise for IHS or another qualified offeror at that time.

### Conclusion

For the reasons stated above, the Court GRANTS the Defendant's and BAE's motions to dismiss for lack of subject matter jurisdiction, and DENIES AS MOOT all of the respective motions for judgment on the administrative record.

This decision is filed under seal. On or before October 12, 2012, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential, or other protected information and submit to the Court any proposed redactions before the opinion is released for publication.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge